All right, we'll call the next matter on calendar, Raven Laveau-Ramsey v. California Department of Corrections, case number 23-2465. Okay, on this case, this is also a pro bono case, so I thank you, both everyone in advance, for participating in the pro bono program and doing that. And I want to, let's see, I show that you've divided your, you're from UC Irvine School, correct? And Jennifer, how do we say that? Quady? Quady? Quady. Quady. Okay, is seven and a half minutes. And Khazra, oh my goodness, very long. Okay, I'm going to make a call at this. Ms. Rabagifina. Close enough? And that, you're seven and a half minutes. And you'll advise me on the rebuttal, and we have here, is that Michael Seplow? And you are the supervising attorney for the law students? All right, well, thank you. All right, so go ahead and proceed and advise me how your, any rebuttal plans. Yes, we would like to reserve three minutes for rebuttal, if possible, Your Honor. Okay, please state your name and appearance. Okay, good morning, Your Honor. Is that three minutes just for you? No, that's total for us. So are you each going to take a minute and a half? Yes, so I'll have six minutes. Mr. Mirzagibayefini will have six minutes, and then we'll have three minutes on rebuttal. Okay, thank you. All right, good morning, Your Honors. May it please the Court, my name is Jennifer Quady, certified law student on behalf of Appellant Mr. Rayvon Ramsey, under the supervision of Michael Seplow in the UC Irvine Appellate Litigation Clinic. My co-counsel, Mr. Mirzagibayefini, will be discussing the claims against Dr. Singh and Dr. Gates, and will address any questions this Court has about qualified immunity. I will begin today by discussing the deliberate and different claims against Dr. Rashid, and I will then discuss how the District Court committed reversible error on procedural grounds by failing to recognize its authority under Federal Rule of Evidence 706. Okay, the clock's not going. Oh, I'm sorry. No, it's okay. There we go. It's going now. See, you just got a few extra seconds. Thank you. Thank you. So yeah, I will start our argument then. No, we heard it. No, we're recording, so go ahead. Okay, got it. Thank you. My co-counsel and I are here before you today because our client was attacked in prison by other inmates and suffered an eye injury so severe, defendant doctor described it as, quote, all parties agree this injury was sufficiently serious. The parties disagree about whether the defendants in this case acted with deliberate indifference to my client's injury by providing grossly inadequate care, which worsened his eyesight. So it's obviously a tragic situation, and I think I can speak for everyone. Of course, we don't want anyone to lose an eye or lose vision as far as that goes, so that's not really the issue. But one of the things in these prisoner cases when you sue in this context, you have to show deliberate indifference, which you said you're going to talk about. But why isn't this just a malpractice case at best? What's the evidence in the record that they were deliberately indifferent? Because I look at this, and there's the fight in the prison, and it's just a mess. He immediately goes to the emergency room. Luckily, I guess there's an ophthalmologist there, and the ophthalmologist also, there's two ER doctors that they determine that either that it look, and you have an eye specialist, which we don't always get in the emergency room, and basically says, hey, you're not going to ever see again, so we can do one of two things. We can pull your eyeball out, or we can do some sort of a cosmetic look so at least you have an eyeball. And they go that route, and then they say, but we're going to be really careful. We're going to send you to someone else after that. So I think it's, what, four days later, he goes to a retinal person. So if I could just clarify part of that. So actually the same day they send him to a specialist doctor, Dr. Rashid, so that's the defendant in this case that we'd like to talk about. But before that, you're correct, he does see an ophthalmologist in the ER. He's very lucky for that, and that is exactly what they say. They say, this is really serious. This is probably going to have to be removed. But then when he goes to see Dr. Rashid. Which is how long after? That's the same day. It's the same day. Okay, so he goes that day. So yes, he goes that day. And our deliberate indifference claim is actually against Dr. Rashid specifically because of the actions that happened in this time frame here. So Dr. Rashid, he sees Dr. Rashid. Dr. Rashid, instead of removing the eyeball, telling him the eyeball needs to be removed, he does schedule a repair for it. When the record is read in the light most favorable to my client, he is performing a standard of care as if he believes that there's visual potential in the eye. But what he does is, instead of having the surgery immediately, which he says in the record at 2 ER 59, he says that this could have occurred immediately if he ordered it as emergency surgery. But he does not. He downgrades it to merely urgent surgery, and then the surgery is rescheduled for four days later. Then gets someone. Yes, the same doctor, Dr. Rashid, then. He repairs the globe. And then again, acting as if there's visual potential in the eye, Dr. Rashid refers him to a retina specialist, and the retina specialist will reattach the retina. And that is a procedure that is not for cosmetic reasons. It's placed at the back of the eye. It's solely something that's done if there's visual potential in the eye. And that's how long for that? That's two months later. And there's, okay. And then, actually, then there's another surgery after that because.  Was that Dr. Chen? That's Dr. Chen. That's correct. And because the retina started to detach. So I guess what I'm looking at from this standpoint, maybe it's a med mal. Maybe someone was below the standard of care. But he looks like he sort of got better than some of us would have gotten. Maybe the President of the United States would have gotten the retinal surgery the same day. But you have to show deliberate indifference, like that doctor just said, well, you're a prisoner. You got in a fight in the yard, and so I'm going to schedule your surgery four days later as opposed to right now. So what's the evidence of deliberate indifference? Yes, Your Honor. Because it seems that he thought, in his view, albeit maybe wrong, that he could do it four days later, and it would be the same result. Your Honor, I think this is a great position to also consider that the district court didn't have additional expert testimony on this, and I think this would be completely clarified if that was added in here. One of your claims says that the district court didn't order him an expert. Yes, correct. The standard of care that Dr. Rashid describes and what he follows is extremely ambiguous. His declaration is ambiguous as to what should have been done and how fast these surgeries should have happened. It's ambiguous in the record, but it was adopted in full by the district court. So Mr. Ramsey had attempted to gain expert testimony. He was pro se at the time. He had submitted some subpoenas for a vitreo retinal surgeon. The court, in denying his subpoenas, stated to Rule 706, which governs the appointment of experts by the court. So the district courts do have discretion to determine whether a neutral expert is needed to assist in the complex cases. Given that discretion, how did the judge abuse his or her discretion here? And why can't we read the record to show that the district court simply concluded it did not need a neutral expert in this case? After all, it does not appear that the district court had any issues addressing the claims. Because the district court didn't say we have considered the matter, we've taken that discretion, and we've used it. Instead, what the district court said is, we simply cannot appoint an expert in this case, which is simply not the rule that this court has taken. This court has explicitly rejected that sort of inflexible interpretation of Rule 706. In a case called McKinney v. Anderson, this case explicitly— Does the district court say anything like, well, I'd really love an expert, but I just can't, and I need help? No, the only thing the district court said was federal—this is a quote— Federal Rule of Evidence 706, which governs the appointment of expert witnesses, does not relieve plaintiff of his obligation to pay fees and expenses for any expert he seeks to call. Simply end quote. That's the only statement we have from the district court. And the real problem with that statement, too, Your Honor, is it misleads our client. It doesn't say to him, if you would like an expert, please make your case for the court. In the same district, in the Eastern District of California, there's a case called Gorton v. Todd, where a similar pro se incarcerated plaintiff had submitted— I believe in that one he was submitting interrogatories, and the court understood that as seeking expert testimony. And what they said in that case was, if you believe this is an exceptional circumstance, please make your case for the court of why you believe that we need a court-appointed expert. But that's not what happened here. Instead, they summarily deny it. They mislead my client into thinking that this is the only way that he can get any expert testimony. And again, they don't mention— Let me find out if my colleagues have any.  No, that's okay. I just want to find out if my colleagues have any. I do have questions, so I'm going to have you go that way. All right. Good morning, counsel. Good morning. What evidence do we have that shows Dr. Rashid knew that there was a serious risk? Are you asking about a serious risk for the four-day delay in surgery? So for the four-day delay in surgery, not only do we believe there's a serious risk of the diagnosis for the eye being, obviously, much more severe. The only evidence we have for that, basically, is that he's an expert. He should know that this should be an urgent matter, especially discussing the severity of the eye. He also, in his reports, only classifies the injury as moderate, but also says it's beyond salvage. We think that's also an ambiguity that could be clarified that should not be decided, actually, on summary judgment. The second part, though, that we would like to emphasize is that there's a significant risk when he's sending our client back to prison with a bandage over the eye about the just pain and suffering that he endures. He describes in his complaint that he was so nauseous from this injury that he wasn't able to eat. He says he contemplated suicide. And he said the eye was consistently bleeding to the point where he kept having to change the dressing and going to seek help on that sort of matter. So we think that risk immediately of the pain and suffering of that eye injury should be inherent. And we believe that that, on its own, is evidence of deliberate indifference. So my understanding of the facts, though, was that Dr. Rashid said, look, I was sending him to the retina specialist just to exhaust every last hope. I didn't actually think he'd be able to get his eyesight back. I just wanted him to know that and hear it from someone else. Is that not correct? That is what he says. But, again, when he does the repair and he sends the retina specialist, we think that's when it's red in the light most favorable to our client on summary judgment. We believe that that infers that he does believe there's some visual potential in the eye, not merely that it's some cosmetic procedure or just to sort of just exhaust every last hope. But that doesn't seem deliberately indifferent if he's giving him every chance in the world to get to see someone else. He's saying, this is my conclusion, but I'm going to let you see someone else so that you're comfortable with that one. That doesn't sound like a deliberately indifferent person. And that's part of the reason here why we believe an expert testimony would be more helpful for this. It's not intuitive to us as lay people who aren't doctors that an injury is so severe that you do nothing to it. So anything it seems that he does seems like he's going the extra mile. But at the same time, it still falls so far below the standard of care that he describes of if there's visual potential, it needs to be seen immediately. So that's where we think there's serious discrepancies in the record. And is it his fault that it took four days? Does he have to schedule it? Who's in charge of scheduling these things? Well, if he would have ordered it as emergency, it would have been performed immediately. When he downgraded it to an urgent surgery, then the hospital scheduling put it that four days later. But he's the one who chose that delayed timeline by putting it as a lower priority matter, if that makes sense. Yeah, and when you say immediately, do you have a time frame? No, those are his words from the declaration of surgery would have been performed immediately. Okay. If you have any more questions, I can give it to my counsel. Great, thank you. We'll give you your, I guess it's 90 seconds for, is it a minute and a half? Yeah. I guess, for rebuttal. This is, in all my 20 plus years, until yesterday, I've never had anyone that asked for 90 seconds for rebuttal. But someone did yesterday, and now you're asking today. So it's hard on our clocks, but we'll do it. Okay. You're, what, is he six minutes? Are you saving a minute and a half or what? Yes. Good morning, Your Honor. Wait a sec. Let us get the clock right. Okay. Go for it. Good morning, Your Honor. Castro Mirza Beghefini, representing Mr. Rayvon Ramsey under the supervision of Michael Seplow. I would like to bring the court's attention to the period from January of 2020, when Dr. Chen first saw Mr. Ramsey, to June of 2020, when the first grievance was dismissed. And the issue before the court is what does the Eighth Amendment demand of a medical grievance reviewer who, through her review, becomes aware that a prisoner is suffering from serious eye pain and losing eyesight, that the existing treatment plan is inadequate, and three, that the treating specialists have left a note saying, call immediately if eye pain or loss of vision. So is there any evidence in the record that Dr. Rashid was responsible for Mr. Ramsey's pain management? And if so, where is that in the record? Your Honor, this is, my statement was about Dr. Singh. Or Chen. So you're talking about Dr. Singh. So you don't know about Dr. Rashid. Is he responsible for pain management? Dr. Rashid claims in the evidence that responsibility lies with the prison staff, and we don't have any evidence contradicting that. The standard in the Ninth Circuit is applied to medical grievance reviewers. Singh and Gates, that would be here. Okay. So what evidence is there after, assume I agree that Ramsey exhausted his claims against Dr. Singh and Gates. What evidence is there at either Dr. Singh or Gates, knowing they are deliberately ignored any risk to Mr. Ramsey's eye? So the pain and the loss of vision was brought to their attention by the grievance. And they read the grievance, and they claimed that they read the medical record, which says if eye pain or loss of vision, call immediately. And they did not do that. And as a result, Mr. Ramsey continued to suffer pain and ultimately lost basically all of his vision. But I guess it seems to me that Dr. Singh and Gates both believed Ramsey was getting medical treatment and denied the request on that basis. So how's that deliberate indifference? Your Honor, the evidence. What evidence contradicts that? The evidence they cite is that on May 6th, which is a month after the grievance is submitted and a month before it is dismissed, Mr. Ramsey saw Dr. Chen and was seeing doctors in general. The issue is that Dr. Chen still put in the note, call immediately if eye pain or loss of vision, which shows that she contemplated a level of pain and loss of vision beyond what she treated in Mr. Ramsey on that day. And the claim that one visit in this two-month period will necessarily have taken care of the pain is, again, contradicted by Dr. Chen's very own instruction, which shows that there may very well be a level of pain beyond that, which went unaddressed during that meeting. Again, the standard that this Court has reiterated many times is that a jury could infer deliberate indifference from the fact that the doctor knew of the extent of pain or ailment, knew that the course of treatment was largely ineffective, and declined to do anything more to improve the situation. And what we have here actually goes a step beyond that, because we also have instruction about what should be done if there is pain or loss of vision, and that is totally disregarded on the basis that on one or two occasions, Mr. Ramsey was seeing doctors throughout this time period. And again, because of this disregard for the issues that Mr. Ramsey had raised in his grievances, he continued to suffer pain and has now lost basically all of his vision. Counsel, is it your position that Dr. Singh and Mr. Gates' reliance on Mr. Ramsey's treating physicians was misplaced? And if so, who should they have relied upon? Your Honor, my contention is that they did not rely on what Dr. Chan said. Had they done what Dr. Chan said, which is call immediately if pain or loss of vision, then they could claim that they just relied on what Dr. Chan did, and regardless of what would have happened, I wouldn't have a deliberate indifference claim here. The issue is that they totally disregarded that and didn't even assess him personally to substitute their own informed medical judgment for Dr. Chan's instructions. Is Gates a doctor? No, Your Honor, Dr. Singh is a doctor. Dr. Gates is not. And my strongest claim is with Dr. Singh's response to the first grievance. So when Mr. – your client, Mr. Ramsey, got his – after Dr. Chan did surgery, but then there was that surgery, the retina was detaching after that. Who was the one that recognized that and took him back into Dr. Chan? How did that happen? Because he had an additional repair surgery, right, after the first surgery. Yes, Your Honor. How did that come about? So the second surgery with Dr. Chan, is that what you're referring to, Your Honor? Yeah, yeah. Yes, that was something that was discussed with Dr. Chan both, I believe, in the February meeting and also the April meeting, and it was always the plan to perform that additional surgery. But if the retina didn't – so it was always on that and it took place, so. Yes, Your Honor, it was something that was discussed as early as the February meeting, but again, it was delayed until the following fall. But again, with the medical grievances, our primary theory here is a theory of pain and a theory of diminished vision from the time that Mr. Ramsey filed the grievance in April to June when Dr. Singh's inadequate and deliberately indifferent response to that came out. Okay. Does anyone have additional questions? Okay, you're over time on that, but you still have your rebuttal. I'll give you your rebuttal time, okay? Thank you. All right, we'll hear from the Department of Corrections. Good morning. Good morning, Your Honors. May it please the Court, my name is Nikolai Grecha. Having worked in this building several years ago, it is a distinct honor for me to return here today, this time as an advocate and counsel for defendants' appellees. Your Honors, this is a case that is, to the record at least, is fact-dense, but it seems to me that the panel has a very good understanding of the facts. The case itself is not difficult. Well, let me ask you this. Okay, several doctors, including Dr. Rashid, concluded that Ramsey's eye was not salvageable. We know that was not true because Dr. Chen appears to have salvaged some of the eye. Apparently, he can see hand movements or something. He doesn't. He's not going to be a pilot, let's just put it that way, but he didn't get. But he can see something. And why does this fact not indicate that the district court should appoint a neutral expert to assess the doctor's conduct in this case, especially given the complexity of the medical issue? We don't dispute that the injury here is very serious. At the time when Dr. Rashid saw Mr. Ramsey, he had already seen, as Your Honor mentioned earlier, in a question to my colleagues on the other side, he had already seen by doctors in the emergency room, and they had concluded that the eye was beyond salvage, that no vision could be restored, and Dr. Rashid himself thought that. Didn't Dr. Rashid, though, make a statement that he was referring Ramsey to a retina specialist to exhaust every last hope? Correct, but that was not Dr. Rashid's hope. He never believed that a vision could be restored. Well, I mean, what you're saying right now kind of drives home the point that I am trying to make, which is that how do we know that, and doesn't that at least raise a genuine issue, a fact that needs to be resolved outside of the summary judgment stage? It does not, Your Honor. Dr. Rashid referred Mr. Ramsey to a retina specialist as an accommodation to Mr. Ramsey. It was more of a second opinion. He certainly didn't believe himself that vision could be restored. That conformed with what the doctors in the emergency room also believed to be true. Explain to me how to read, quote, exhaust every last hope to have the sort of interpretation that you're offering, which is that that was not actually the medical doctor's opinion but simply was done as an accommodation to. Well, when Mr. Ramsey first saw Dr. Rashid the day after the incident, Dr. Rashid provided him with two options. One was inucleation, which is in layman's terms removing the eyeball. The other one was just cosmetic repair with the understanding that he would never again regain vision. Mr. Ramsey concedes that at his deposition. And I quote the response by Mr. Ramsey is that the question was, did you have an understanding you were going to be permanently blind in the left eye? Mr. Ramsey responded, yes, that's what he had revealed to me, that I was going to be blind for the rest of my life. It was really, we cited in our brief some medical journals explaining that the psychological toll of an injury as serious as this is quite high. And so to put Mr. Ramsey's mind at ease that every opportunity had been exhausted to restore his vision, Dr. Rashid referring to a retina specialist. But the standard of care was for Dr. Rashid to first perform his surgery, which is the globe repair, again, purely for cosmetic damages to preserve the integrity of the eyeball. And then later on, if there was any potential for vision to be regained, for the retina to be reattached. So it seems to me you're making a little bit of an argument at this no good deed goes unpunished. He didn't think that there was any chance, but he's recognized that Mr. Ramsey might need more assurance on that. But as it turns out, and I don't really know how good his vision is now, but as it turns out that he got something back. So there's always that woulda, coulda, shoulda. If Dr. Chen, say, had been there in the emergency room, would he be able to see better? So you're correct, Your Honor, that after the first surgery, he was able to go beyond having light sensitivity to perceiving some type of movement. But the record appears to indicate that that only happened because his eye was being injected with a silicon. And as soon as that silicon wore off, he lost the ability to see even any hand movements. Certainly, I think the Eighth Amendment doesn't require that doctors be miracle workers. And it could be that if you saw enough specialists, at some point somebody may have been able to do something more than what Dr. Rashid has done. But that's really not the inquiry here. The inquiry is whether Dr. Rashid himself was deliberately indifferent. And that is a very high legal standard. And we know from the Farmer v. Brennan and Toguchi v. Chang line of cases that what is required, the state of mind that is required, there is more akin to criminal recklessness. And certainly, on the facts of this case, it cannot be said that Dr. Rashid didn't go above and beyond for Mr. Ramsey. Your Honors, counsel on the other side had also mentioned the notion that Mr. Ramsey was feeling suicidal and that he was not receiving adequate pain. That is also contradicted by the record. We know that when he returned to custody, he was referred on an urgent basis to have mental health treatment. That he had ongoing pain medication that were provided to him by his treating physicians at the prison. And that he, on a daily basis, was going... Was that just Tylenol or was it more than that? It was Tylenol-3, which has codeine. It's an opioid. So it's definitely stronger than over-the-counter Tylenol that we could buy at a regular drugstore. And his bandages were changed on a daily basis, his dressing. The whole point was to stabilize the eye and to cover it so that any movement of the eye was avoided. Well, your friend on the other side seems to say that the district court misunderstood... I can't remember if it's a his or a her here. Who was the district court? Judge Drozd.  Judge Drozd. So it's a he. I know him. And then there was a magistrate judge too, I think. Judge Peterson. Yeah, Judge Peterson. Okay. That she seems... Your friend on the other side seems to be saying that the district court didn't understand it could appoint an expert. And so it was wrong. What's your reading of the record? Well, first of all, I think there's a little bit of a mischaracterization of what happened in the district court. So Mr. Ramsey submitted a request for subpoenas to be issued, but he failed to provide the requisite fees to go along with it. So his request was denied. The purpose of Rule 706 is not for a party to advocate for himself. And there was no expert that was needed at the district court level to decide the issue of the Eighth Amendment, whether this violated the Eighth Amendment or not. That is a purely legal question. There's no indication that the district court is confused about the facts of this case, such that it needed an expert to explain the medical components of this case. Well, I guess the argument would be that, you know, there's some medical injuries that are a little more obvious, like if someone's got a gaping hole, that, you know, that's one thing. The eye, I think most of us don't really know too much about that. And so we're talking about whether it was deliberately indifferent to schedule the surgery as urgent as opposed to emergency. Wouldn't an expert be helpful? I don't know. You know, I don't know enough about the eye to say whether three or four days matters or not. Well, I think that the issue is a lot simpler than that. We're looking specifically only at what Dr. Rashid did and the information he had available before him. And remember that Dr. Rashid only saw Mr. Ramsey for two weeks. That's it. Mr. Ramsey was under his care for two weeks. After that, Dr. Rashid never saw him again. And during that time, we're looking at what Dr. Rashid knew to be true. The fact that some other doctor later down the road could have performed a different surgery or perhaps a surgery that restored a little bit of a vision is just purely a difference in medical opinion. And that is not sufficient for a claim for deliberate indifference. The fact that Dr. Chen herself was scheduling Mr. Ramsey to be seen and performing the surgeries several weeks after seeing him perhaps counters the argument that this was really an emergency. The first time that Dr. Ramsey, excuse me, Dr. Chen saw Mr. Ramsey, she performed the first surgery four weeks after that encounter. Her notes also, though, indicated that perhaps there could have been a different outcome had he received care earlier. Correct? Not quite, Your Honor. Her notes, and I believe you're referring to the statement where she said that the timing of the first surgery may contribute to a poor overall prognosis. Certainly, there's no evidence in the record that Dr. Chen attributed that delay to Dr. Rashid. Nor is there any evidence that she disagreed with Dr. Rashid's initial recommendation. Does that require? Does she need to specifically place that delay responsibility at the feet of a particular individual? She does not, but without more, it's just a difference in medical opinion. And that's perhaps what she was hinting at. But even from that statement, it isn't clear that she was attributing anything to Dr. Rashid himself. And we certainly know that he is not the one who was in charge of scheduling that referral that took almost two months. And even Mr. Ramsey, at his deposition, conceded when he was asked that a doctor at the prison was keeping him informed of the status of the referral, and the doctor was indicating to him that the prison was having a difficult time finding a specialist and then having him see the doctor. So I don't read that statement, Your Honor, to suggest that Dr. Chen somehow put this on Dr. Rashid. And the defendant's appellee's expert witness also opined that any such evaluation about the timing of it would be purely speculative at that time, given the seriousness of the injury. Thank you. I would like to also mention, Your Honor, to the extent you want to hear me on this, that the reviewers, the grievance reviewers, Dr. Singh, he was local to the prison. He was a doctor, he was a chief physician and surgeon at the prison. Ms. Gates, on the other hand, is the chief of the healthcare appeals branch for the California Correctional Healthcare Services. She is not a doctor. But the two of them were involved in the grievance process, Dr. Singh at the institutional level of review, the prison, and Ms. Gates at the headquarters level of review. As they were reviewing the grievances, Mr. Ramsey was actively undergoing medical care, not just by his medical team at the prison, but also actively seeing Dr. Chen at her eye clinic or doctors who were working at the eye clinic. And certainly every single time he was going to see Dr. Chen, Dr. Chen noted in her notes that there was no changed circumstances that required a different course of treatment. So opposing counsel, I think, mischaracterizes the urgency of the situation there, too. Had it been the case that he was indeed in a lot of pain and that he expressed any new concerns to his team, either at the prison or to Dr. Chen, he would have been seen on a speedier basis. And he wasn't. So what does the record show? How often was he seeing Dr. Chen? It differed. Initially, it became that he was seeing her every about four to six weeks, three weeks. And then throughout 2020, he was under the care of Dr. Chen. And in 2021, he was being seen maybe every two to three months. So the spacing of the follow-up consultations, I think, also speak to the fact that this was not something that was currently evolving and that necessitated any additional care. The last surgery came out of one of those follow-up things where Dr. Chen could see that the retina was detaching again? In November of 2020, yes. That was the second surgery that the retina had become detached again. Dr. Chen performed the surgery. Was that Dr. Chen repairing her surgery, her first surgery? It was the first surgery that had attached the retina to begin with, correct. And then she did follow-up surgery because it was coming undone. Yes. And there is no indication that I could glean anyway from the record that somehow after that second surgery, his vision was restored to the way it had been before the prison fight. Counsel, can I take you back to the question about an expert being appointed for Mr. Ramsey? If I remember correctly, I think you stated, well, he never really asked for one. I mean, was that your position? Certainly. He only asked for the issuance of subpoenas, presumably subpoenas that he was going to use for an expert, a retina specialist. But we saw that the court cited to Federal Rule of Evidence 706. So they kind of knew what he was asking for. Why not get him his expert? Would that not have helped? Everybody kind of have a better understanding or either nip this in the bud and say, look, your own expert or the neutral expert that we hired to inform us says that everything was done correctly. But he never. Well, I think two parts of that answer. First of all, this this whole argument about the expert, I think, is waived because it was raised for the first time on appeal. But even if the court were to consider it right now, it's not explicit in the district court that Mr. Ramsey specifically asked for an expert. He didn't. He only asked for the issuance of subpoenas. What he was going to do with that is is speculating at this time. But let me switch back on that for a second. I mean, how clear does someone have to ask for an expert? Mr. Ramsey is not a lawyer. He's not someone who's probably well versed in the law to know. I need an expert. And here's the case law that says I am entitled to one. And certainly, even if you were, as you must have been given a liberal interpretation to his request as a pro se litigant. Ultimately, the standard here for the denial of the subpoenas is abuse of discretion. So we're asking whether this court abuses discretion and denying that request. And if the district court didn't feel the need to appoint an expert to understand the issues before the court, then it didn't. OK. Your Honors, I see that. You're out of time. My time is up. My colleagues have any. We don't have any additional questions. Thank you for your argument. That case I prepared to submit and ask that this court affirm the judgment below. Thank you.  OK. Rebuttal by Ms. Quadey. Thank you, Your Honors. I first have just two points on the last thing that you were asking about. Mr. Ramsey was not required to request an expert in this case, even though the court did understand his actions as seeking a court appointed expert. And we described that in our briefing as well. But this argument is not waived. The court also on its own could have sua sponte decided that they needed an expert. This isn't something that Mr. Ramsey is explicitly required. Excuse me, is explicitly required to ask for. And even if he was required, we do also state that he was completely misled on the way that the phrasing of the order stands, saying that if he wants an expert, he must pay for one, which is a misstatement of the law. That language describes to him that there is no more remedy for the situation. I also want to mention, too, that opposing counsel had mentioned about Dr. Rashid's statement of trying to exhaust every last hope. And they mentioned that there's they had submitted on appeal some information about patient psychology, about the difficulties of losing an eye. We just want to point out that that wasn't raised at the district court. That's medical evidence that the opposing counsel has submitted in their briefing that wasn't raised at the district court. And that we believe that that's evidence for this court that a court appointed expert would have been significantly helpful in this case. At the very least, there's medical questions here that opposing counsel and myself are going back and forth on that we believe a court appointed expert could have clarified at the district court or the district court itself should have clarified. All right. You're out of time. Oh, my apologies. All right. OK. Can I argue Mr. Michigan by Phoenix minutes really quickly? If he wants to cede his time to you. All right. That means you don't get to come up. You understand that. OK. You can have another minute and 30 seconds. Thank you. All right. I just have really quickly. I just want to mention Dr. Chen noted there's significant scar tissue because of the delay in seeing her. And that's why there had to be these multiple surgeries by her. She's the one who scheduled those. Dr. Singh didn't bring Mr. Ramsey in because of an issue that they saw. And then lastly, I just want to mention that this isn't a case of difference in medical opinion. This is a case where Dr. Rashid and Dr. Chen both agree that if there's visual potential in the eye, a certain series of events need to occur. And those events occurred extremely slow or they didn't occur at all. So what we respectfully submit and we ask this court to reverse in this in this case. Thank you. Thank you both for your argument in this matter. Just like in the prior case, we would. It's it sounds like you were a law clerk at the Ninth Circuit. That's what it sounds like. And you're law students. And we were happy to see everyone here. And we will we would we look forward to welcoming you back when you're past the bar. Thank you both for your argument. This matter will stand submitted.
judges: CALLAHAN, DESAI, ALBA